**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

RANDON MAZZIE,


                              Plaintiff,


              -v-                                          1:22-CV-01181 (AJB/TWD)


ADMAR SUPPLY CO., INC., et al.,


                              Defendants.
_____

**APPEARANCES:**                                  **OF COUNSEL:**

CHARNY & WHEELER P.C.                     H. JOSEPH CRONEN, ESQ.
Attorneys for Plaintiff                            NATHANIEL K. CHARNY, ESQ.
42 West Market Street
Rhinebeck, NY 12572

MICHAEL G. MCCARTIN LAW PLLC          MICHAEL G. MCCARTIN, ESQ.
Attorneys for Defendants
38 Mall Way #513
West Sand Lake, NY 12196

BOLAÑOS LOWE PLLC                          WILLIAM Q. LOWE, ESQ.
Attorneys for Defendants
16 S. Main Street – Suite B
Pittsford, NY 14534

**Hon. Anthony Brindisi, U.S. District Judge:**

**DECISION & ORDER**

## I.    INTRODUCTION

Plaintiff Randon Mazzie brings this action against Admar Supply Co., Inc., Timothy

Wells, and Laurie Alund, alleging violations of the Americans with Disabilities Act ("ADA") and

discrimination on the basis of disability in violation of the New York State Human Rights Law

("NYSHRL"), N.Y. Exec. Law § 296.  *See* Am. Compl., Dkt. No. 13.  Before the Court is

defendants' motion for summary judgment.  *See* Dkt. No. 43.  For the reasons set forth below,

defendants' motion is **GRANTED**.

## II.    BACKGROUND

Randon Mazzie ("Mazzie") worked as a "Rental Coordinator / Dispatcher" for Admar

Supply Company, Inc. ("Admar"), a construction equipment supplier, in its Latham, New York

location from December 2020 to March 2021.  *See* Dkt. No. 43-5 at 1; Pl.'s Depo., Dkt. No. 45-4

at 41–42; Pl. Resp., Dkt. No. 48-5 at 8.

There, Mazzie shared a workstation, which was located at a ten-foot-long counter, in the

front showroom alongside defendant Laurie Alund ("Alund") and Tim Bolliger ("Bolliger"), a

rental manager and Alund's immediate supervisor.  Pl.'s Depo., Dkt. No. 45-4 at 43, 48–49.

Mazzie kept only one personal item at the workstation: a picture of him with his son.  Pl.'s

Depo., Dkt. No. 45-4 at 49.  About five feet away from the counter, defendant Tim Wells

("Wells"), the Latham branch manager, had an enclosed office.  Pl.'s Depo., Dkt. No. 45-4 at 48–

49; Am. Compl., Dkt. No. 13 ¶ 15.

Near the beginning of his time with Admar, in December 2020, Mazzie separately

informed Alund and Wells that he suffered from PTSD, anxiety, and depression.  *See* Mazzie

Depo., Dkt. No. 45-4 at 50–51  ("Q: [D]o you recall any of the symptoms that you described for

[Wells]?  A: I don't know off the top of my head, no.  I don't remember specifically how the conversation [went]."); Alund Depo., Dkt. No. 48-3 ("We had a conversation one morning when he came in and seemed to be distressed.  I asked him if he was alright, and he explained that he did have anxiety, extreme anxiety and PTSD.").

At the time that Admar hired Mazzie, there was no dedicated 'dispatcher' at the Latham branch.  Dkt. No. 43-6 ¶ 6; *see* Dkt. No. 45-4 at 48 ("[U]ntil I took over, everybody did [it]—it was never consolidated to one person.").  As Mazzie had experience in such a role, Admar hired him to handle both dispatching and renting, at a higher rate of pay than previous rental coordinators, intending to have him eventually focus on dispatch duties.  Wells Decl., Dkt. No. 43-6 ¶¶ 6, 7; Dkt. No. 48 at 2.

A month into the job, in early January, Mazzie took over dispatch operations.  *See* Dkt. No. 45-4 at 53.  Mazzie found juggling his dispatching and coordinating duties to be difficult. *See* Dkt. No. 45-2 at 16 ("[B]oth jobs became very overwhelming with learning a new position that I was never familiar with and performing my old one.").  In short order, Mazzie broached the subject with Wells.  *See* Dkt. No. 45-2 at 16 ("[Wells] said that he would make rental coordinator my secondary position, but it was still to be known that I was to perform both if needed."); *id.* at 17 ("Q: [D]o you recall what you requested from [Wells]?  A: Just a little bit of help.  If I was on the desk and dispatch needed to be done that I could have help on the rental coordinator side."); *id.* ("Q: Did you tell [Wells] why you needed that modification?  A: Yes. Q: What did you tell him?  A: I told him that it was overwhelming, that I wasn't receiving support from either [Bolliger] or [Alund], that I was feeling that I had to . . . stay equal with them while performing my rental coordinator duties as well as doing dispatch operations by myself."); *id.* at 17–18 ("Q: Did you tell them that this had anything to do with any of your disabilities[?]

3

A: Absolutely, I explained . . . that the overwhelming circumstances between holding both positions really triggered my anxiety and it made it very hard for me to focus on my job.").

Sometimes, Mazzie would ask for assistance with his responsibilities and how to perform them from Alund and Bolliger.  Dkt. No. 45-4 at 52–53; Dkt. No. 13 ¶ 43.  From Mazzie's telling, Alund was not thrilled by the arrangement at which Mazzie and Wells had arrived: "She had one time said that it wasn't her fault that . . . I had anxiety and couldn't perform my duties to standard[:] [W]hy should it be taken out on her[?] Why should she have to pull extra weight[?]"  Dkt. No. 45-2 at 18–19.  But Wells "brushed [the remark] off," telling Alund and Mazzie that "this is the way it's going to be."  Dkt. No. 45-2 at 19.

Despite Wells' directive, Mazzie claims that Alund would "respond to [Mazzie's] requests for assistance with insults about [his] mental abilities, further exacerbating [his] disabilities."  Dkt. No. 45-4 at 53.  Mazzie asserts that it was during this first week of his assuming dispatch responsibilities that Alund first insulted his mental acumen; although Mazzie does not remember precisely what was said.  *Id.* at 54 ("Q: [W]hat did she say on that occasion?  Do you remember?  A: Verbatim, I do not.  Q: Suffice it to say, she said something you perceived as insulting; correct?  A: That's correct.").

Even so, Mazzie does recall attempting to de-escalate the perceived tension, telling Alund, "I didn't appreciate that; I'm just trying to learn this new job, and . . . I'm looking for help."  Mazzie Depo., Dkt. No. 45-4 at 54; *see id.* at 54–55 ("I don't know if it was a request for assistance[,] it wasn't a formal request.  It was just at our desks and something came up.  I don't remember exactly what it was.  I know that she ha[d] more experience than I did, so I leaned on her for help.  She seemed to get frustrated[.]"); Dkt. No. 45-4 at 55 ("Q: Did you report that

interaction to anyone?  A: No.  [Alund] seemed apologetic.  And at first, it felt like she didn't realize that she had done it.  So, I made her aware and left it at that.").

That same week, Mazzie mistakenly sent an Admar driver to retrieve equipment en route to deliver a different piece of equipment, failing to realize that the two pieces of equipment could not fit simultaneously on the truck.  Dkt. No. 45-4 at 56; *id.* ("I sent a driver out . . . due to my inexperience in my role, and [Alund] got really frustrated at it because . . . the driver had already left, and it could have been done a better way.").  Mazzie noted, "[I]nstead of just telling me it could have been done a better way, [Alund] decided to . . . say I was stupid[:] 'You shouldn't have done it.  You should have asked me.'"  Mazzie Depo., Dkt. No. 45-4 at 56; *But see id.* at 57 ("She did not say, 'You're stupid.'  That was—no.  She said, 'That was stupid' and along the lines of, 'Use your head' or 'If you don't know the answer, just ask me.'").  Mazzie, taken aback by Alund's reaction, "gave [him]self a chance to cool off," steered clear of Alund for the rest of their shift, and "then discussed it with [defendant] Wells the next day."  Dkt. No. 45-4 at 57.

On January 15, 2021, Mazzie brought his first complaint regarding Alund to Wells.  *See* Dkt. No. 45-2 at 31; *id.* at 34 ("Q: Do you remember what you told [Wells] about how your ability to do your job was impaired?  A: Not verbatim.  But I do know that it had to do—along the lines of her being frustrated that I was given . . . special treatment for my disabilities.  That if I couldn't do my job to standard, that I shouldn't be given extra . . . responsibilities, extra duties."); Dkt. No. 45-4 at 57 ("I was like, 'this is—it wasn't that serious of an issue.  [L]esson learned.'").

A few weeks later, Mazzie made a comparable misstep.  Mazzie Depo., Dkt. No. 45-2 at 1; *id.* ("We had a similar situation with . . . just what was able to fit on a truck.  I had made a mistake.").  According to Mazzie, "in [his] opinion, [Alund] felt that at that time in [Mazzie's]

position, [Mazzie] shouldn't have made mistakes."  Dkt. No. 45-2 at 1.  Though Mazzie does not

recall what Alund said, he asserts that she was "extremely upset" and used the word "idiotic[.]"

Dkt. No. 45-2 at 2 ("I believe I told her it was unprofessional.  I didn't appreciate it.").

        Alund used the term "idiotic" on one other occasion in reference to Mazzie.  Dkt. No. 45-

2 at 1; *id.* at 1–2 ("Q: So that's a total of two occasions; is that correct?  A: That's correct."); *id.*

at 2–3 ("Q: Did you believe that [Alund] was using that term specifically in reference to any of

your disabilities?  A: I don't know.  I don't know [her] reasoning behind it.  It's not personally

something I would have done.").

        Mazzie also believes that Alund used the word "stupid" regarding him about five times.

*See* Dkt. No. 45-4 at 57–58.  On one such occasion Tim Bolliger, Alund's manager, was present.

Dkt. No. 45-4 at 58.  Bolliger, according to Mazzie, "addressed it immediately."  *Id.*  Bolliger

chastised Alund, informing her "it was unacceptable," they were there "to work as a team," and

Mazzie was "not going to ever get better if [he's] being put down."  Mazzie Depo., Dkt. No. 45-4

at 58; *see also id.* ("Q: What was [Alund's] response to that?  A: She didn't seem to care.  She

didn't really respect [Bolliger] much."); *see also id.* at 59 ("Q: [D]id you ever hear or observe . . .

Alund call anyone else stupid or referring to their actions as stupid?  A: Yes, I have.").

        Mazzie asserts that he informed Alund that her words negatively affected him.  *See*

Mazzie Depo., Dkt. No. 45-2 at 12 ("I informed Laurie [on] multiple occasions that when words

are being used that are provocative or inappropriate towards me that, you know, it flusters my

brain.  It's hard for me to learn.  It's hard for me to think.  A lot of the times it will take over

completely.  It will take over my mind completely because I don't know how to . . .

compartmentalize that type of stuff.  I don't think somebody should have to learn how to put that

aside."); Dkt. No. 45-2 at 23 ("Q: [H]ow many times would you say that you told Defendant

Alund that the way she was treating you was negatively affecting your disabilities?  A: I don't know exactly how many, but it was more than once[.]  I'd say it was around ten[.]").

Specifically, Mazzie points to an interaction in early January 2021 in which he complained to Alund about her demeanor.  *See* Am. Compl., Dkt. No. 13 ¶ 59; Mazzie Depo., Dkt. No. 45-2 at 28 ("I told her how I was feeling and she seemed frustrated by it.  She seemed to realistically just blow off the fact that I was feeling—you know, I had anxiety and that I was becoming very anxious.  And I felt that—in my mind, I felt that she was upset that I had taken over dispatch operations, and if she could hinder my job performance in any way, she would.").  Mazzie also felt that Alund "contemptuously dismissed [his] concerns."  *See* Am. Compl., Dkt. No. 13 ¶ 60; Mazzie Depo., Dkt. No. 45-2 ("She would act like I was invisible.  She would turn around, stare at her computer, or do something else or walk away, making it completely awkward to work next to somebody like that.").

Several weeks later, in early February 2021, Mazzie complained again to Wells about Alund's behavior in a one-on-one meeting.  *See* Am. Compl., Dkt. No. 13 ¶ 67 (reiterating that "it was worsening Plaintiff's anxiety and other disabilities"); Mazzie Depo., Dkt. No. 45-2 at 34 ("Q: Do you recall what words you used with Mr. Wells on this occasion?  A: I don't know exactly the words no.").  Mazzie contends that during this conversation he "again request[ed] a reasonable accommodation for disability."  Am. Compl., Dkt. No. 13 ¶ 67; *see* Mazzie Depo., Dkt. No. 45-2 at 37 ("Q: [W]hat is it that you asked [Defendants] to do at this meeting for an accommodation?  A: The same accommodation I asked for before.  Just reiterated it[.]  That I needed more opportunity to do my dispatch operations role if it was going to be done properly.");  *id.* ("Q: Any accommodation that you requested at this meeting beyond . . . more help in doing the dispatch role?  A: I don't know.  Q: [W]as there any specific action, again, that you wanted

Tim Wells to take[?]  A: At that point, I was just overwhelmed, I didn't know what to do or what to ask for[.]  I felt that [Alund] was very vindicative towards the position I was in and really upset at . . . the request for accommodations that I had asked for because of my disabilities.  It seemed that she felt that my disabilities weren't valid and that it was just an excuse.").

Mazzie also relates a complaint he lodged with Alund in February 2021.  Mazzie Depo., Dkt. No. 45-2 at 24 ("I remember one time . . . mid-February, I had told her that it has to stop, that, you know, her—her—the way she speaks to me does not translate well to my anxiety.  [I]t really hurts my head, my learning, my ability to do my job."); *id.* at 25 ("Q: Do you remember her response to that?  A: Again, [Alund] doesn't have responses.  She would just pretend like I didn't exist, ignore me completely, walk past me, make it a completely awkward workplace, seeing as we were eight feet apart, and I had to be over on her side of the office almost all day because that's where the dispatch board was.  [I]t got to the point where I would just not speak to her unless I absolutely had to or if it had to do with my job.").

Alund's behavior extended beyond verbal comments, Mazzie asserts; she would also take work orders from the office printer and keep them, which Mazzie claims interfered with his work.  *See* Dkt. No. 45-2 at 9–10 ("[Alund] would take . . . some of our orders . . . and she would keep them to herself, which hindered my ability to do my new job[.]  I can't schedule something for delivery or pickup if I don't have the order . . . in front of me or available at the printer where it's supposed to be[.]").

On March 9, 2021, Mazzie met a third time with Wells to discuss Alund.  Am. Compl., Dkt. No. 13 ¶ 70; Dkt. No. 45-3 ("I had told [Wells] that [I] was still having difficulties doing my job.  He asked what the difficulties were.  I explained to him that [i]t's extremely overwhelming with [Alund] constantly belittling me, to be able to do my job.  I asked for [Wells] to ask [Alund]

to make it stop or—yeah. Yeah[,] asked him to ask her to make it stop.  Q: [A]ny other actions

that you requested from Wells at that time?  A: No, not really.  I don't think so.  Q: [D]id he tell

you anything in response to your complaint at that meeting?  A: No, he did not.  Q: He didn't

indicate that he was going to do anything?  A: Well, he always said he was going to.  I don't

know if he ever did.  If he did, she wasn't listening[.]").

Matters came to a head on the morning of March 11, 2021, when Alund again "belittled

[Mazzie's] mental abilities" by "yelling at [Mazzie] and calling him 'stupid.'"  Shortly afterward,

Alund referred to Mazzie as a "crybaby" behind his back and told a coworker that she could not

wait for Mazzie to quit.  Dkt. No. 45-2 at 4; Dkt. No. 45-3 at 23.

Mazzie overheard both remarks.  *See, e.g.*, Dkt. No. 45-2 at 4 ("[I] had overheard her

saying that I was a crybaby.  I was being a crybaby about the situation.").  "Extremely

agitated[,]" Mazzie took the picture of his son off his desk and left work.  Dkt. No. 48-5 at 9; *see*

Alund Depo., Dkt. No. 48-3 at 11 ("[A]fter a little while, [Mazzie] got up from his desk and

walked out the front door[;] I believed at that time he was going to get something out of his

car.").

At about 8:54 am, Mazzie then texted Wells: "I just left, I'm not dealing with the constant

attitude[,] the constant talking down and talking behind my back from [Alund.]  I'm going to

rethink my position here at ADMAR."  Dkt. No. 43-4 at 2.  Within the hour, Wells replied that he

would pull Alund into his office and "have a pretty cut and dry conversation[,]" and that—if

Mazzie intended to come in the next day—Wells would like to have both him and Alund in his

office.  Dkt. No. 43-4 at 2.  Receiving no response from Mazzie, at around 10:25 am, Wells

texted Mazzie again, stating he just left a voicemail and asking Mazzie to call him.  Dkt. No. 43-

4 at 3.

After not hearing back from Mazzie, Wells texted again at 3:13 pm, inquiring, "[W]hat is your plan moving forward?  Since you literally cleared everything out is it safe to assume I will not be seeing you[?]"  Dkt. No. 43-4 at 3.  At 4:35 pm, Mazzie responded: "I'm not quitting.  I was/am mad[.]  I was going to call you after I calmed down[.]  I don't want to flip out because again no one should have to do that a [sic] workplace.  I am overwhelmed by it and her and I need a few days and I'll be back Monday."  Dkt. No. 43-4 at 4.  In fact, Thursday, March 11 would be Mazzie's last day in the office.  Dkt. No. 45-3 at 40.

The next day, Friday, March 12, 2021, Wells spoke with Mazzie on the phone, informing Mazzie that he "was no longer an employee at Admar for job abandonment."  Dkt. No. 45-3 at 29.  In a text message exchange following that call, Mazzie contested that characterization of events.  *See* Dkt. No. 43-4 at 6 ("No I went home early due to conflict with another employee that you failed to handle when it was brought to your attention two days prior.").  In that text exchange, Mazzie asserted that Wells had just fired him, which Wells denied immediately.  *See* Dkt. No. 43-4 at 7 ("I am not firing you.  You cleared out your desk and took all personal items[.]").  Moreover, Wells added, "you also just told me you were resigning anywa[y]s."  Dkt. No. 43-4 at 7; *see* Dkt. No. 45-3 at 27 ("Q: Did you state on that call that you were resigning or intended to resign?  A: No.  Not that I remember."); *But see* Dkt No. 43-4 at 5 ("You did fire me you just called me and said I'm no longer an employee at ADMAR because of job abandonment for leaving yesterday.  And yes I was resigning with notice.").

## III.    STANDARD OF REVIEW

Under Rule 56, summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "A genuine factual dispute exists, and summary judgment is

therefore inappropriate, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Linton v. Zorn*, 135 F.4th 19, 30 (2d Cir. 2025) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

A fact is 'material' if "it might affect the outcome of the suit under the governing law[.]" *Red Tree Invs., LLC v. Petróleos de Venezuela, S.A.*, 82 F.4th 161, 170 (2d Cir. 2023). In reviewing the motion, the district court must "draw all reasonable inferences against the party whose motion is under consideration." *Suluki v. Credit One Bank, NA*, 138 F.4th 709, 719 (2d Cir. 2025). However, "[a] question of material fact does not exist merely because the plaintiff disagrees with the deposition testimony and documentary evidence produced by the defendant[s]." *Andrade v. Cultural Care, Inc.*, 706 F. Supp. 3d 348, 355 (E.D.N.Y. 2023), *appeal withdrawn,* 2024 WL 1651337 (2d Cir. Mar. 18, 2024).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts[.]" *Felton v. Monroe Cmty. Coll.*, 747 F. Supp. 3d 603, 616 (W.D.N.Y. 2024) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). Rather, the nonmovant "must identify specific facts and affirmative evidence that contradict those offered by the moving party to demonstrate that there is a genuine issue for trial." *Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 349 (E.D.N.Y. 2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Michel v. Yale Univ.*, 110 F.4th 551, 560 (2d Cir. 2024) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587).

## IV.    DISCUSSION

Mazzie brings claims against defendant Admar Supply Co., Inc. ("Admar") alleging disability discrimination in the form of failure to accommodate and discriminatory termination under the ADA.  Mazzie also brings a retaliation claim against Admar under the ADA.  Additionally, Mazzie brings disability discrimination and retaliation claims against all three defendants under the NYSHRL.  Defendants move for summary judgment with respect to all claims.  The Court now considers each claim in turn.

### A.    Reasonable Accommodation Claim

The ADA requires employers to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."  42 U.S.C. § 12112(b)(5)(A); *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013) ("An employer may also violate the ADA by failing to provide a reasonable accommodation."); *McSweeney v. Cohen*, 776 F. Supp. 3d 200, 249 (S.D.N.Y. 2025).

"To establish a prima facie case of discrimination based on an employer's failure to accommodate a disability, under . . . the ADA [,] a plaintiff must demonstrate that (1) he is a person with a disability under the meaning of the statute in question; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations."  *Stanley v. City Univ. of New York*, 2023 WL 2714181, at *19 (S.D.N.Y. Mar. 30, 2023), *aff'd sub nom. Stanley v. Phelon*, 2024 WL 1453872 (2d Cir. Apr. 4, 2024) (cleaned up).

Mazzie states repeatedly that he made requests for accommodation.  But it is difficult to identify the contours of those requests.  For example, the operative complaint lacks any detail on

the issue and is phrased largely in conclusory terms. *See, e.g.*, Am. Compl., Dkt. No. 13 ¶ 58 ("[P]laintiff repeatedly . . . requested reasonable accommodation(s) for his disability in good faith."); *id.* ¶ 67 ("[P]laintiff again complained to Defendant Wells regarding Defendant Alund's behavior, reiterating that it was worsening Plaintiff's anxiety and other disabilities and again requesting a reasonable accommodation for disability."); *id.* ¶¶ 72–73 ("Plaintiff again explained that this treatment was triggering his anxiety and other disabilities as well as impeding his ability to do his job.  As such, Plaintiff renewed his . . . requests for reasonable accommodation."); *id.* ¶¶ 93–94 ("Despite Plaintiff's numerous requests for accommodation, Defendants failed to discuss with Plaintiff how they might be able to accommodate Plaintiff's disabilities.  As such, Defendants failed to enter into an interactive process with Plaintiff to determine how they could accommodate Plaintiff's reasonable requests to accommodate his disabilities.").

At points, Mazzie's deposition testimony regarding the substance of his alleged accommodation requests is similarly vague. *See, e.g.*, Dkt. No. 45-2 at 38 ("A: [I] felt that [Alund] was very vindictive towards the position I was in and really upset at—you know, at the request for accommodations that I had asked for because of my disabilities."); *id.* at 19–20 ("A: [I]t did not make it easier . . . with [Alund's] frustration seemingly towards my disabilities and the accommodation I had asked for.  Q: Just to be clear, when you say, 'the accommodation you had asked for,' which accommodation are we referring to?  A: The accommodation of—that we've been talking about.").

Elsewhere, his testimony is unclear and fails to provide a consistent account of the facts. *See, e.g.,* Dkt. No. 45-2 at 37 ("Q: Any accommodation that you requested at this meeting beyond that, beyond asking for more help in doing the dispatch role?  A: I don't know."); *id.* ("Q: [S]o I'm clear, you were asking for more help in doing your dispatch role.  Was there any

specific action . . . that you wanted Tim Wells to take that you thought would accomplish that for you?  A: At that point, I was just overwhelmed.  I didn't know what to do or what to ask for at that point.").

In the few instances in which Mazzie's testimony provides some semblance of specificity, he divulges that the thrust of his purported accommodation requests was for "more availability to learn [his] new job."  Dkt. No. 45-2 at 21; *see* Dkt. No. 45-2 at 37 ("Q: Okay.  What is it that you asked them to do at this meeting for an accommodation?  A: The same accommodation I asked for before.  Just reiterated it.  Q: [W]hat accommodation is that?  That you needed help?  A: That I needed more opportunity to do my dispatch operations role if it was going to be done properly."); Dkt. No. 45-2 at 21 ("[I] asked for modification . . . for the rental coordinator duties.  So I feel that all of these [duties] are in the job description so they would all fall under the same accommodation and the same modification.").

To the extent that these appeals for "more opportunity" and "more availability" can be construed as accommodation requests, Mazzie has proffered no evidence that they were denied by his supervisor.  *See, e.g.,* Dkt. No. 45-2 at 18 ("Q: [W]hat was [Wells'] response to that?  A: He understood.  [H]e sent out an email to . . . myself, Bolliger, and [Alund] stating that I was to be a primary dispatch operations with (sic) still functioning secondary as a rental coordinator.").[1]

Mazzie pivots on the nature of his alleged accommodation requests in his opposition papers.  There, Mazzie articulates—for the first time—that he had "requested two primary accommodations: (1) that Alund stop triggering his disabilities[,] and (2) to take two days off[,]

---

[1] Although Mazzie contends that Wells' response was insufficient to ameliorate the difficulties he was having with his dual roles, Mazzie does not elaborate or explain why.  Instead, he complains about Alund's reaction to the accommodation measures that Wells provided.  *See* Dkt. No. 45-2 at 18 ("Q: Did that take care of the difficulties that you were having with managing both of these positions?  A: No.  Q: Did you revisit the issue with [Wells] then?  A: Yes.  Q: [W]hat did you tell him?"  A: I told him that it seemed to me that Laurie was very frustrated with my disabilities, that she felt that it was unfair that I didn't have to pull my weight on the rental counter.").

March 11–12[,] because of his disabilities." Pl.'s Resp., Dkt. No. 48-5 at 23. Ultimately, neither protestation is availing; both merely attempt to reframe Mazzie's actions as qualifying ADA accommodation requests in a manner that is wholly uncorroborated by the available record.

The latter "request" identified in Mazzie's opposition papers demonstrates this lack of evidentiary foundation most clearly. There, Mazzie now contends that the message he sent Wells on March 11, slightly before 9:00 am, after leaving the office was "a simple request for accommodation[.]" Dkt. No. 48-5 at 28.

> Hey man I know you're not at work today. I just left, I'm not dealing with the constant attitude in [sic] the constant talking down and talking behind my back from Laurie. I've done nothing but try to help end [sic] it's getting to the point where I'm on the verge of being a disrespectful person and that's not who I am. I'm going to rethink my position here at ADMAR.

Dkt. No. 43-4 at 3.

Mazzie claims that by sending this message, "[he] *advised* Wells that he had left for the day *because of* his disability." Pl.'s Resp., Dkt. No. 48-5 at 28 (emphases added). But the record is devoid of any indication that Mazzie told defendants before, or on, that day that last-minute or emergency absences might be warranted due to his disabilities. *See also* Mazzie Depo., Dkt. No. 45-3 at 25 ("Q: Have you ever left work early in the day from any [prior] jobs in response to a disability? A: No, I have not. Q: Okay. Put another way, have you ever taken a mental health day from any of those? A: Not that I can recall, specifically for a mental health day.").

Even assuming Mazzie had previously informed defendants of such a potential need, no rational factfinder could conclude that his text message makes a request of any sort. Rather, the message—as Mazzie himself puts it—"advised" Wells of actions Mazzie had already taken, and no evidence in the record ties Mazzie's message or the sudden departure to his disabilities.

Only at the end of that workday, at around 4:30 pm, after ignoring Wells' attempts over the prior eight hours to reach him, did Mazzie reply:

> I'm not quitting.  I was/am mad.  And sick of it.  I was going to call you after I calmed down.  It's bull and no one should have to deal with that daily.  She does that shit on purpose and when you're not there she's worse.  I don't want to flip out because again no one should have to do that a [sic] workplace.  I am overwhelmed by it and her and I need a few days and I'll be back Monday.

Dkt. No. 43-4 at 4.

This message, at least, does mention taking off a discrete number of days.  Still, it was not a request for a disability accommodation.  Again, it was not a request of any sort.  It was a notice—and one of an action that Mazzie had already undertaken unilaterally.

Mazzie's messages on that day and the next offer no hint of a connection between his conduct, the time off, and his disabilities.  Yet "[a]n employer's duty to accommodate an employee's disability is ordinarily activated by a request from the employee, and the request must be sufficiently direct and specific to give the employer notice of the needed accommodation."  *See Dooley v. JetBlue Airways Corp.*, 636 F. App'x 16, 19 (2d Cir. 2015) (citing *Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 129 (1st Cir. 2009)).

Hence, "[p]laintiff cannot hold [d]efendant[s] liable for reasonable accommodations that []he never requested."  *Dolac v. Cnty. of Erie*, 2018 WL 10780484, at *6 (W.D.N.Y. Sept. 28, 2018), *report and recommendation adopted,* 2020 WL 2840071 (W.D.N.Y. June 1, 2020), *aff'd,* 2021 WL 5267722 (2d Cir. Nov. 12, 2021) (quoting *DeMar v. Car-Freshner Corp.*, 49 F. Supp. 2d 84, 95 (N.D.N.Y. 1999)); *Beaton v. Metro. Transportation Auth. New York City Transit*, 2016 WL 3387301, at *8 (S.D.N.Y. June 15, 2016) ("An employer cannot refuse to make an accommodation that it was never asked to make.") (internal citations omitted).  Even if Mazzie's texts amounted to an accommodation request, it would not have necessarily entitled him to

approval by defendants. "[E]mployers are not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee." *Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 95 (2d Cir. 2015).

Based on the record before the Court, no reasonable jury could find that Mazzie prospectively and sufficiently requested any absence-related disability accommodation. Rather, when viewed in the light most favorable to Mazzie, his requests can, at best, be interpreted as asking the defendants to excuse his unapproved absence. But "[a] requested accommodation that simply excuses past misconduct is unreasonable as a matter of law." *McElwee v. Cnty. of Orange*, 700 F.3d 635, 641 (2d Cir. 2012); *accord Casanova v. Wyndham Grand Rio Mar Beach Resort & Spa*, 205 F. Supp. 3d 220, 233 (D.P.R. 2016) (granting summary judgment to defendant on failure-to-accommodate claim where plaintiff, "[i]n essence, ask[ed] [the court] to conclude that her present justification of past performance issues, namely, unauthorized absences from work constitute[d] a request for reasonable accommodation"); *Morgan v. Mercedes-Benz U.S. Int'l, Inc.*, 2020 WL 1083210, at *7 (N.D. Ala. Mar. 5, 2020) (granting summary judgment dismissal where employee, shortly after suspension and shortly before termination, requested as an accommodation to use accrued vacation time to cover prior unexcused absence); *Reese v. Zimmer Prod., Inc.*, 2018 WL 4510453, at *8 (N.D. Ind. Sept. 19, 2018) (dismissing claim where plaintiff had "not pointed to any case where the retroactive excusing of absences, or of any other conduct that would normally justify termination of employment, was identified as a reasonable accommodation under the ADA"); *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 90 (1st Cir. 2012) ("When an employee requests an accommodation for the first time only after it becomes clear that an adverse employment action is imminent, such a request can be 'too little, too late.'")

(listing cases); *cf. Pierre v. Univ. of Dayton*, 143 F. Supp. 3d 703, 710 (S.D. Ohio 2015) ("[T]he majority of federal courts agree that an after-the-fact accommodation request is not timely[.]").

Neither is there anything in the record to suggest that Mazzie put defendants on notice, or that they should have otherwise been on notice, that Alund's sporadic comments and general demeanor towards Mazzie had an impact on any disability. *See, e.g.*, *Woloshin v. Rutgers Univ.*, 2016 WL 5660460, at *5 (D.N.J. Sept. 28, 2016) ("[T]here is nothing in the record evidence to suggest Defendants were aware that Plaintiff needed an accommodation, or that he did not know how to ask for one. Accordingly, Defendants' obligation to participate in the interactive process with Plaintiff . . . was not triggered.").

Even if Mazzie's complaints about Alund amounted to an accommodation request,[2] there is no evidence from which to conclude that Mazzie requested a *reasonable* accommodation. *See McMillan*, 711 F.3d at 126 ("In discrimination claims based . . . on failures to accommodate, the plaintiff 'bears the burdens of both production and persuasion as to the existence of some accommodation that would allow [him] to perform the essential functions of [his] employment[.]'") (quoting *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009)).

The first of the two purported "primary" accommodation requests mentioned in Mazzie's opposition papers—"that Alund stop triggering [Mazzie's] disabilities" and that "[she] not discriminate against him"[3]—is so nebulous and conclusory as to be a non-starter. *See, e.g.*,

---

[2] "Notably lacking are the details of th[e] conversation, or details regarding any follow-up conversations that may have occurred in which a requested accommodation was discussed[.]" *Angelika P. v. Town of Meredith*, 2022 WL 706849, at *10 (D.N.H. Mar. 9, 2022).

[3] Pl.'s Resp., Dkt. No. 48-5 at 24; *see also id.* at 25–26 ("Plaintiff merely requested that his interactions with Alund be limited only to what was necessary for him to do his job and that she not mock him for his disabilities because it was impairing his ability to do his job."); *id.* at 27 ("Plaintiff requested the simple accommodation that Alund not abuse him or limit her conversations with him to work-related topics so that Plaintiff could do his job.").

*Schwarzkopf v. Brunswick Corp.*, 833 F. Supp. 2d 1106, 1122–23 (D. Minn. 2011) ("[Plaintiff] argues that he requested a reasonable accommodation by asking that his supervisors (and others) not yell at him[.]  [S]uch a request is not reasonable.  Indeed, courts have found that there exists 'no authority for the proposition that cessation of harassment is a required reasonable accommodation.'  *Rodriguez v. John Muir Med. Ctr.*, 2010 WL 3448567, at *12 (N.D. Cal. Aug. 31, 2010); *accord, e.g., Cox v. Peak*, 2010 WL 3860499, at *10 (S.D. Ohio Apr. 16, 2010) [ ] (plaintiff failed to propose reasonable accommodation by asking her 'supervisors to leave me alone, you know, and my coworkers to stop bothering me and harassing me, intimidating me, making me feel like I'm this high (indicating)'), *adopted*, 2010 WL 3769105 (S.D. Ohio Sept. 24, 2010)."); *see also Becker v. Linn Cnty., Iowa*, 2021 WL 5746000, at *11 (N.D. Iowa Dec. 1, 2021) ("[E]ven if a reasonable jury found that a plaintiff requested a harassment-free workplace, that reasonable jury could not find that the plaintiff requested a 'reasonable accommodation' because no legal authority treats the elimination of harassment as a reasonable accommodation."); *id.* at *11 ("The [c]ourt . . . declines to extend a reasonable accommodation to include a harassment-free workplace.").

Considered in the light most favorable to Mazzie, these requests may be interpreted as efforts to avoid working with or alongside Alund.  Yet "[t]o the extent [the] ADA claim might be construed as a request for an accommodation that involved no contact with . . . a single co-worker[,] that request [is] unreasonable as a matter of law."  *Butrym v. Burnt Hills-Ballston Lake Cent. Sch. Dist.*, 2022 WL 1102413, at *8 (N.D.N.Y. Apr. 13, 2022) (Hurd, J.); *see Wang v. HP, Inc.*, 2020 WL 674352, at *6 (D. Conn. Feb. 11, 2020) ("[T]he Second Circuit has affirmed summary judgment rulings that conclude, for example, that a 'request for an accommodation of no contact with any co-workers . . . [is] unreasonable as a matter of law.'") (quoting *Theilig v.*

19

*United Tech Corp.*, 415 F. App'x 331, 333 (2d Cir. 2011) (summary order)); *see also Kennedy v. Dresser Rand Co.*, 193 F.3d 120, 123 (2d Cir. 1999) ("[Plaintiff's] request was . . . for protection from *any* interaction with [supervisor][;] in the context of the particular workplace described in the record before us, it would be virtually impossible for [plaintiff] to perform her job of coordinating workers' compensation claims without at least some contact with [supervisor], who supervises all health care personnel and who is the plant 'expert' on workers' compensation[.]") (emphasis in original); *accord Rough v. GlaxoSmithKline LLC*, 2022 WL 2966440, at *8 (D. Mont. July 27, 2022), *aff'd,* 2023 WL 4557741 (9th Cir. July 17, 2023) (collecting cases).

Any other construction of Mazzie's reported complaints about Alund—those supported by record evidence, at least—amounts to a request that is impracticable. *See* Mazzie Depo., Dkt. No. 45-3 at 21–22 ("Q: Would a reasonable accommodation—in your opinion, would that have entailed restricting the use of certain words? A: I mean . . . I don't know how to—I don't know. I don't know—certain words. Q: [W]ould a reasonable accommodation have included prohibiting Ms. Alund from using the words we've talked about[:] stupid, idiotic, crybaby? A: I mean, yeah. Those are general words you shouldn't use towards anybody regardless of their disabilities, but yeah. I suppose.").

Supposing that an accommodation amounting to a set of speech restrictions imposed by Mazzie—applicable solely to one coworker[4]—would be lawful, let alone appropriate under the ADA, the words cited above are presumably not the only ones that Mazzie would find demeaning.[5] Yet Mazzie offers no indication of what other words, terms, or phrases warrant

---

[4] *See* Mazzie Depo., Dkt. No. 45-3 at 22 ("Q: [W]ould a reasonable accommodation to you in this case have entailed modifying any employee's behavior besides Laurie Alund[?] A: [L]aurie was the one that really affected me on a daily basis, day to day.")

[5] *See* Mazzie Depo., Dkt. No. 45-2 at 12 ("I informed Laurie [on] multiple occasions that when words are being used that are provocative or inappropriate towards me that, you know, it flusters my brain. It's hard for me to learn. It's hard for me to think. A lot of the times it will take over completely.").

prohibition, and the Court is unaware of any means by which defendants could otherwise foretell all of them—short of clairvoyance, for which the record provides no evidence. In essence, an accommodation targeting Alund's speech would require that Mazzie wield approval authority over what Alund could say to, around, or about him.

But "the ADA protects against disability discrimination[;] [it] is not otherwise a general civility code for the American workplace." *Marini v. Costco Wholesale Corp.*, 64 F. Supp. 3d 317, 326 (D. Conn. 2014) (citing *Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 97 (2d Cir. 2012)); *see also Calise v. New York State Dep't of Motor Vehicles*, 2020 WL 1309062, at *12 (S.D.N.Y. Mar. 19, 2020) ("[R]ude and derogatory comments, absent any discriminatory connotation, are not enough to establish a . . . discrimination claim.").

An accommodation permitting Mazzie to prohibit comments by Alund that he subjectively perceives as discriminatory, despite not being objectively so, is unreasonable as a matter of law. In any event, it is unclear that restrictions on Alund's speech would suffice. *See* Mazzie Depo., Dkt. No. 45-2 at 25 (remarking that Alund's silence made for "a completely awkward workplace, seeing as [the two] were eight feet apart . . . all day"); *id.* at 29 ("She would act like I was invisible. She would turn around, stare at her computer, or do something else or walk away, making it completely awkward to work next to somebody like that.").

The unreasonableness of such an accommodation is clear; it merits no further consideration. Mazzie's failure to accommodate claim must be dismissed.[6]

---

[6] To the extent Mazzie argues that defendants failed to engage in the interactive process (*see* Dkt. No. 48-5 at 27–28)—"even if the record supported as much, which it does not—that is not an independent basis for an ADA claim." *Muller v. NAES Corp.*, 2023 WL 2165343, at *10 n.5 (N.D.N.Y. Feb. 22, 2023) (Sannes, C.J.); *see also McBride*, 583 F.3d at 101 ("[W]e adopt the reasoning of our sister Circuits and hold that an employer's failure to engage in a sufficient interactive process does not form the basis of a claim under the ADA and evidence thereof does not allow a plaintiff to avoid summary judgment unless she also establishes that, at least with the aid of some identified accommodation, she was qualified for the position at issue.").

### B.    Hostile Work Environment Claim[7]

Mazzie also submits that summary judgment is precluded on his hostile work environment claim, "because Alund tormented [him] for two months because of his disabilities." Pl.'s Resp., Dkt. No. 48-5 at 7.

"Unlike claims based on discrete acts of discrimination or retaliation, incidents that give rise to a hostile work environment occur over a series of days or perhaps years and a single act of harassment may not be actionable on its own." *Hawley v. OPWDD-Cent. NY DDSO*, 2025 WL 1127447, at *18 (N.D.N.Y. Apr. 16, 2025) (citing *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 258 (2d Cir. 2023)). Thus, "the alleged conduct in many hostile work environment cases must be repeated or ongoing before it is adequately severe or pervasive to constitute a violation." *Id.* (quoting *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015)).

"To prevail on a hostile work environment claim, [a plaintiff] must show (1) that the harassment was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment, and (2) that a specific basis exists for imputing the objectionable conduct to the employer." *Stanley v. Phelon*, 2024 WL 1453872, at *4 (summary order) (quoting *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 74 (2d Cir. 2019)); *see also Knope v. Garland*, 2021 WL 5183536, at *4 (2d Cir. Nov. 9, 2021) (summary order) (noting the elements of a hostile work environment claim are substantially similar under the ADA, the Rehabilitation Act, and Title VII).

---

[7] In response to defendants' motion, Mazzie asserts that he was also subjected to a retaliatory hostile work environment. *See* Dkt. No. 48-5 at 11. However, no such claim was asserted in the amended complaint. *See generally* Dkt. No. 13. "A plaintiff may not assert a claim for the first time in opposition to a motion for summary judgment." *Vitti v. Macy's Inc.*, 758 F. App'x 153, 158 (2d Cir. 2018) (summary order) (citing *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013)).

"An employee must prove both objective and subjective elements of [their] claim." *Knope*, 2021 WL 5183536, at *4. "First, the employee must prove the objective requirement, *i.e.*, that the employer created an environment that a reasonable person would find hostile or abusive." *Id.* (quoting *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)). "Second, the employee must prove the subjective requirement, *i.e.*, that the employee subjectively perceived the employer's conduct as hostile or abusive." *Id.* "Finally, the employee must demonstrate a causal element: that the employer created a hostile environment because of a protected characteristic." *Id.*

"Here," Mazzie argues, "the hostile work environment started in early-to-mid January and lasted until March 12, 2021[.]" Pl.'s Resp., Dkt. No. 48-5 at 29. In support of his claim, Mazzie asserts the following: Alund "called [him] 'stupid' about five times—at times in the presence of others[,"] [s]he said was [sic] 'idiotic' twice[,] [and] called him a crybaby within in [sic] earshot" of him. Dkt. No. 48-5 at 29.

Mazzie adds that, "[b]eyond this[,] Alund's demeanor was hostile and aggressive[,] [and] Alund would go out of her way to make his job harder, for example by taking work orders he needed to do his job off the printer." *Id.* at 29–30. Alund also "complained about having to give him what [she] saw as special treatment." *Id.* at 30. "Alund's mockery hampered [Mazzie's] ability to perform his job's core functions, such as learning how to handle his new responsibilities and thinking so he could interact with customers and complete assignments." Dkt. No. 48-5 at 8.

Mazzie maintains that Alund's "comments are clearly associated with [his] disabilities because they speak to his mental abilities." Dkt. No. 48-5 at 30; *But see, e.g.,* Mazzie Depo., Dkt. No. 45-4 at 59 ("[W]hy did you believe that the use of that term, ['stupid'], was related

specifically to your disabilities?  A: I'm not sure if it was related just to my disabilities."); *see also* Mazzie Depo., Dkt. No. 45-2 at 7 ("A: I believe that [the complaint] says that she disliked working with me—specifically me—and that I suffer from disabilities such as PTSD, depression, and anxiety."); *id.* at 7 ("Q: [J]ust so I'm clear—you intend to mean that [Alund] disliked working with you and you have disabilities.  You are not opining as to her reasons for disliking working with you; is that correct?  A: I don't know her reasons for disliking me.  Q: Okay.  A: I have no idea why she disliked me.").

He also complains of Alund's removal of work orders from the office printer.  *See* Mazzie Depo., Dkt. No. 45-2 at 9–10 ("A: She would take [work orders] off the printer and she would keep them to herself, which hindered my ability to do my new job because I can't schedule something for delivery or pickup if I don't have the order in front—in front of me or available at the printer where it's supposed to be—where it's supposed to remain or in the file—the wall files where they're supposed to be filed if not given to me directly.  [I]f a client needs a piece of equipment for a job to start at 9 a.m., and I don't see the work order that's been on her desk until 10:00 a.m., you can't get a piece of equipment there on time.").

In addition, he complains that Alund would not always update internal records to reflect that returned equipment was available for rental.  *See* Mazzie Depo., Dkt. No. 45-2 at 11 ("I don't know what her reasoning was[,] but a lot of the times it was because she wanted the piece of equipment if it was a high item, and she knew that . . . [if] one of her top customers was going to need it, she would save it.").  Aside from these comments and conduct, Mazzie asserts that "Alund's demeanor" towards him was "hostile and aggressive[.]"  *See* Mazzie Depo., Dkt. No. 45-3 ("I was receiving an attitude being, you know, sort of general demeanor of her tone and tone of her voice towards me was very aggressive, I would say, and just rude and uncalled for.").

24

When reviewing hostile work environment claims, "[c]ourts are . . . 'cautioned to consider the totality of the circumstances, and to evaluate the quantity, frequency, and severity of the incidents,' and must consider those factors 'cumulatively,' so that [they] may 'obtain a realistic view of the work environment.'" *Williams v. New York City Hous. Auth.*, 61 F.4th 55, 74 (2d Cir. 2023) (quoting *Richardson v. New York State Dep't of Corr. Servs.*, 180 F.3d 426, 437 (2d Cir. 1999)).

Yet Mazzie's filings and the record, "read in their totality, [only] reveal workplace rudeness, which is 'not enough to give rise to an actionable hostile work environment claim.'" *Marecheau v. Equal Emp. Pracs. Comm'n*, 2014 WL 5026142, at *8 (S.D.N.Y. Sept. 30, 2014) (quoting *De la Cruz v. City of New York*, 783 F. Supp. 2d 622, 639 (S.D.N.Y. 2011)).

The Court is not insensitive to Mazzie's condition; however, to reiterate, "the ADA does not impose a civility code." *Id.* (quoting *Krist*, 688 F.3d at 97); *see also Schneidermesser v. NYU Grossman Sch. of Med.*, 2024 WL 4135701, at *7 (S.D.N.Y. Sept. 10, 2024). ("Isolated incidents or episodic stray remarks are not sufficiently continuous and concerted in order to be deemed pervasive.").

Simply put, Mazzie's assertions of defendants' misconduct are insufficient to permit a rational factfinder to conclude that his working environment was ever objectively hostile.

Further, there is no evidence to support Mazzie's claim that either Admar or Wells is liable for any alleged incidents involving Alund.[8] The record is clear that the two defendants "provided several avenues for [p]laintiff to complain about allegedly hostile incidents in his work environments, and that [Admar] supervisors responded promptly to his complaints—often in

---

[8] *Pannikadavil,* 2008 WL 2876525, at *9 n.28 ("Plaintiff also alleges that [supervisor]'s actions contributed to the hostile work environment, but he presents no evidence to support that claim.  Therefore, none of [supervisor's] conduct in the record can be imputed to make Defendants liable for a hostile work environment claim.") (internal citations omitted).

[p]laintiff's favor." *See Pannikadavil v. New York City Health & Hosps. Corp.*, 2008 WL 2876525, at *9 (S.D.N.Y. July 23, 2008). Mazzie's hostile work environment claim thus also fails for failure to impute the alleged conduct of Alund to defendants Admar or Wells.

Defendants are entitled to summary judgment on Mazzie's ADA hostile work environment claim.

## C.    Discriminatory Discharge Claim

### i.    *Wrongful Termination*

Mazzie further alleges that defendants discriminated against him by wrongfully terminating his employment because of his disability. *See* Am. Compl., Dkt. No. 13 at 12–13.

Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See McMillan*, 711 F.3d at 125. Under this framework, a plaintiff bears the initial burden of proving their prima facie case of discrimination by a preponderance of the evidence. *Kirkland-Hudson v. Mount Vernon City Sch. Dist.*, 665 F. Supp. 3d 412, 457 (S.D.N.Y. 2023).

To establish a prima facie discrimination claim under the ADA, a plaintiff must show by a preponderance of the evidence that "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." *McMillan*, 711 F.3d at 125 (quoting *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006)).

Specifically, a plaintiff must satisfy the last element of his prima facie case by showing that the adverse employment action "took place under circumstances giving rise to an inference of discrimination." *See Carter v. TD Bank, N.A.*, 2023 WL 3818589, at *12 (D. Conn. June 5,

2023), *aff'd,* 2024 WL 2828470 (2d Cir. June 4, 2024) (quoting *Davis v. New York City Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015)).

"If the plaintiff establishes a prima facie case, and if the defendant then proffers a legitimate, nondiscriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to show that the defendant's proffered reason was pretextual." *Carter*, 2023 WL 3818589, at *13 (citing *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir. 1999)). "The plaintiff will ultimately prevail on his ADA discrimination claim only if he proves that his disability was 'the but-for cause' of the adverse employment action." *Carter*, 2023 WL 3818589, at *13 (citing *Natofsky v. City of New York*, 921 F.3d 337, 349 (2d Cir. 2019)).

Here, the parties dispute whether Mazzie has demonstrated the fourth prong. Mazzie asserts that "Defendants fired [him]," thus, he believes, "satisfying the adverse employment prong[.]" Pl.'s Resp., Dkt. No. 48-5 at 13. In turn, defendants argue that Mazzie was not fired; he resigned. *See, e.g.*, Defs.' Mot., Dkt. No. 43-10 at 24 ("[T]he facts show that [Mazzie] was not terminated in the first place, rather, [he] left voluntarily on March 11, 2021."); *id.* at 25–26 ("[M]azzie has provided no evidence of an adverse employment decision against him, much less that any decision by defendants was motivated by a discriminatory animus.").

Per Mazzie, since defendants "contend that [he] did not experience an adverse employment action because he quit[,] genuine issues of material fact preclude summary judgment on this point." Dkt. No. 48-5 at 13. Mazzie proclaims that removing the picture of his son from his workstation on March 11, "at this stage—when [he] is entitled to every favorable inference—[c]annot be seen as evidence that he resigned[,]" once again "rendering summary judgment inappropriate." *Id.* at 14. Mazzie misses the forest for the trees.

For purposes of resolving the pending motion, and drawing all reasonable inferences against defendants, the Court will accept Mazzie's supposition that he was terminated.  As a result, "defendant must produce evidence supporting an explanation for the termination which, 'taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.'"  *Turner v. Delta Airlines, Inc.*, 658 F. Supp. 3d 123, 132 (E.D.N.Y. 2023), *appeal withdrawn sub nom. Turner v. Delta Air Lines, Inc.*, 2023 WL 4311227 (2d Cir. June 14, 2023) (quoting *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir. 2000)).

"[T]he defendant need not persuade the court that it was motivated by the reason it provides; rather it must simply articulate an explanation that, if true, would connote lawful behavior."  *Sotak v. Bertoni*, 501 F. Supp. 3d 59, 78 (N.D.N.Y. 2020) (Hurd. J.).  "[T]his burden is one of production, not persuasion; it can involve no credibility assessment."  *Musante v. Mohawk Valley Cmty. Coll.*, 270 F. Supp. 3d 564, 577 (N.D.N.Y. 2017) (Hurd, J.); *see also Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 129 (2d Cir. 2012) ("[W]hile the presumption shifts the burden of production to the defendant, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.") (internal alterations and citations omitted).

"[C]ourts have consistently held that they may not second-guess an employer's non-discriminatory business decisions, regardless of their wisdom, unless there is actual evidence that they were motivated by discrimination.  Federal courts do not hold a roving commission to review business judgments."  *Peters v. Mount Sinai Hosp.*, 2010 WL 1372686, at *9 (S.D.N.Y. Mar. 30, 2010) (citing *Montana v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir. 1989)).

Defendants have articulated a legitimate, non-discriminatory reason for Mazzie's termination: job abandonment. As Mazzie highlights, he "texted Wells on March 12[,] '[Y]ou just called me and said I'm no longer an employee at ADMAR because of job abandonment for leaving yesterday.'" Pl.'s Resp., Dkt. No. 48-5 at 16 (quoting Dkt. No. 43-4 at 5); *see* Mazzie Depo., Dkt. No. 45-3 ("Q: [S]o what was discussed on the call between you and Wells if not your resignation? A: [H]e called me and said, 'I'm calling to inform you that you are no longer an employee at Admar for job abandonment.' Q: What was your response to that? A: I didn't abandon my job. Q: That's what you told him? A: Yes."); Am. Compl. ¶ 85 ("Defendant Wells informed Plaintiff that Plaintiff was no longer employed by Defendant Admar, claiming that Plaintiff had abandoned his position."); *id.* ¶ 89 ("Defendant Wells replied that Plaintiff would not be returning to work with Defendants, realleging that Plaintiff had abandoned his position."); *see also* Pl.'s Statement of Additional Material Facts in Dispute, Dkt. No. 48 ¶ 30 (reiterating Wells informed Mazzie that he was no longer an Admar employee because of job abandonment).

Mazzie argues, then and now, that his absence did not qualify as job abandonment. *See* Dkt. No. 43-4 at 7 (texting Wells: "FYI – me leaving work yesterday was not job abandonment as you stated as the reason for firing me"); *id.* (accompanying screenshot of unidentified New York Department of Labor document stating a worker abandons their job if "absent for five consecutively previously scheduled days without prior notification").

But that's beside the point. "An employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Altman v. New Rochelle Pub. Sch. Dist.*, 2016 WL 3181153, at *4 (S.D.N.Y. June 2, 2016) (quoting *DeLuca v. Allied Domecq Quick Serv. Restaurants*, 2006 WL 1662611, at *9 (E.D.N.Y. June 13, 2006)). Even if defendants were mistaken about the number

of days of absence required to appropriately consider an employee as having "abandoned" their

job, they still have presented a legitimate, non-discriminatory reason for Mazzie's termination.

"If the defendant satisfies its burden of production, then the presumption raised by the

prima facie case is rebutted and drops from the case." *Shaham v. Vertrax, Inc.*, 2023 WL

2600207, at *11 (D. Conn. Mar. 22, 2023) (quoting *Bucalo*, 691 F.3d at 129).  "At the final stage,

the plaintiff then has 'the opportunity to demonstrate that the proffered reason was not the true

reason for the employment decision'—a burden that 'merges with the ultimate burden of

persuading the court that [he or] she has been the victim of intentional discrimination.'" *Bucalo*,

691 F.3d at 129 (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981)).

Mazzie has put forth insufficient evidence to rebut defendants' non-discriminatory reason

for his separation from Admar.  *See* Dkt. No. 45-3 at 32–33 ("Q: Why do you believe that [Wells]

didn't want to [continue to] employ you because you were disabled?"  A: I felt that he was —I

felt that he just didn't want to accommodate for the disability anymore.  I felt that it was making

him do his job too much.  I mean, he was never in the office, and I had to always bring stuff to

his attention.  And when I did, he started getting frustrated by it.  It felt like it was a burden to

him, and I felt like my disabilities were a burden to him, and he just didn't want to deal with it

anymore."); *see also* Dkt. No. 45-3 at 33 ("Q: Any other basis for your belief that he didn't want

to employ you anymore because you are disabled?  A: Well.  Besides the fact that I asked to take

a mental health day, and less than 24 hours later, I was being terminated, no.").

As already discussed, Mazzie did not ask Wells for a "mental health day."  Mazzie left his

workstation, notified Wells after the fact of his departure, and at no point conveyed to Wells that

his exit was related in any way to his disability.  Mazzie offers only his sense that Wells harbored

some discriminatory animus, which resulted in his termination.  But Mazzie's feelings that his

termination was motivated by a discriminatory animus, absent any evidence supporting those feelings, cannot satisfy his burden of persuasion. He has not shown that his termination took place under circumstances giving rise to an inference of discrimination.

       *ii.    Constructive Discharge*

       Mazzie also argues, for the first time in his opposition papers, that "in the alternative, Defendants constructively discharged Plaintiff[.]"  Dkt. No. 48-5 at 16.  "Constructive discharge" has two legally relevant meanings in employment discrimination actions.  *Noh v. Admarketplace, Inc.*, 2025 WL 965882, at *5 (S.D.N.Y. Mar. 28, 2025).

       The first is as an independent claim for relief.  "This type of constructive discharge claim has been characterized as a 'hostile-environment constructive discharge' claim and requires that a plaintiff sufficiently allege a hostile work environment in order to adequately allege a constructive discharge claim."  *Bright-Asante v. Saks & Co., Inc.*, 242 F. Supp. 3d 229, 243 (S.D.N.Y. 2017), *aff'd,* 855 F. App'x 40 (2d Cir. 2021) (summary order) (citing *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004)).

       "Where an alleged constructive discharge stems from an alleged hostile work environment, a plaintiff 'must show working conditions so intolerable that a reasonable person would have felt compelled to resign,'" which amounts to a "standard . . . higher than the standard for establishing a hostile work environment."  *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010) (quoting *Pennsylvania State Police*, 542 U.S. at 147)); *Atkinson v. Singh*, 2022 WL 137634, at *14 (S.D.N.Y. Jan. 14, 2022).

       "Constructive discharge may also be asserted as the adverse employment action *element* of a separate employment discrimination claim."  *Noh v. Admarketplace, Inc.*, 2025 WL 965882, at *6 (S.D.N.Y. Mar. 28, 2025) (emphasis in original); *see Dall v. St. Catherine of Siena Med.*

*Ctr.*, 966 F. Supp. 2d 167, 177 (E.D.N.Y. 2013) ("A constructive discharge is functionally the same as an actual termination and therefore is considered an adverse employment action.").  The adverse employment action of constructive discharge can occur "when an employer intentionally creates a work atmosphere so intolerable that the plaintiff is forced to quit involuntarily." *Atkinson*, 2022 WL 137634, at *14 (citing *Borski v. Staten Island Rapid Transit*, 413 F. App'x 409, 411 (2d Cir. 2011) (summary order)) (internal alterations omitted).

Whichever meaning Mazzie intends to apply in this case, it does not matter.  If Mazzie endeavors to present constructive discharge as an independent claim, he may not do so.  "It is well established that 'it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.'"  *Lichtman v. Chase Bank USA, N.A.*, 2020 WL 1989486, at *4 n.7 (S.D.N.Y. Apr. 27, 2020) (quoting *Wilson v. City of N.Y.*, 480 F. App'x 592, 594 (2d Cir. 2012) (summary order)).

Moreover, this assertion of constructive discharge contradicts his pleading.  *See generally* Am. Compl., Dkt. No. 13; *see also id.* ¶¶ 90–92 ("On or about March 12, 2021, Defendants terminated Plaintiff.  Plaintiff did not resign from his position with Defendants.  Plaintiff did not abandon his position with Defendants.").  And, although presented in his opposition papers, this assertion appears to contradict his contemporaneously filed counterstatement of material facts. Dkt. No. 48 at 4 ("Disputed that Plaintiff quit.  Plaintiff was fired.").

Regardless, "[a]lleging that Plaintiff was terminated or that Plaintiff suffered a loss of employment is not a sufficient means by which to assert a constructive discharge theory." *Facci-Brahler v. Montgomery Cnty.*, 2025 WL 743949, at *4 (N.D.N.Y. Mar. 7, 2025) (Nardacci, J.). "A plaintiff must prove first that he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign[;] [b]ut he must also

show that he actually resigned." *Green v. Brennan*, 578 U.S. 547, 555 (2016).  Mazzie has

presented no evidence that he resigned.  "Absent evidence of actual resignation, [plaintiff] cannot

avail himself of the constructive discharge doctrine." *Perry v. Floss Bar, Inc.*, 2021 WL 871436,

at *8 (S.D.N.Y. Mar. 8, 2021); *cf.* Pl.'s Resp., Dkt. No. 48-5 ("Defendants cannot have it both

ways—[Mazzie] either quit or he was terminated[.]").

If Mazzie meant to offer constructive discharge as the adverse employment action for his

discriminatory discharge claim, that too is unavailing.  Because Mazzie has failed to establish a

hostile work environment, he cannot meet the higher standard required here; thus, his claim of

constructive discharge would also fail.  *Fincher*, 604 F.3d at 725.

Accordingly, no reasonable jury could find that Mazzie was subject to unlawful

discrimination "because of" his disability.  Mazzie's ADA discrimination claim must be

dismissed.

### D.    Retaliation Claim

The ADA prohibits retaliation against an individual who has opposed any act or practice

made unlawful under the ADA.  *Harris v. Bronx Parent Hous. Network, Inc.*, 2020 WL 763740,

at *3 (S.D.N.Y. Feb. 14, 2020) (citing 42 U.S.C. § 12203)).  "As with ADA discrimination

claims, retaliation claims under the ADA are also subject to the *McDonnell Douglas* burden-

shifting framework." *Telesford v. New York City Dep't of Educ.*, 2023 WL 6366051, at *1 (2d

Cir. Sept. 29, 2023) (citing *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002)).

"To establish a prima facie case of retaliation, [a plaintiff] must show that: '(1) he

engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the

employer took adverse employment action against him; and (4) a causal connection exists

between the alleged adverse action and the protected activity.'" *Frantti v. New York*, 850 F.

App'x 17, 21 (2d Cir. 2021) (quoting *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002)); *see also Mitchell v. Planned Parenthood of Greater New York, Inc.*, 745 F. Supp. 3d 68, 96–97 (S.D.N.Y. 2024) (noting similarity between ADA and Title VII retaliation provisions).

"An employee's activity is protected even if 'his condition was not a disability within the meaning of the ADA,' so long as he alleges 'that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated' the ADA,  and that 'the employer understood, or could reasonably have understood' that the employee believed the challenged conduct was discriminatory." *Batista v. Consol. Edison of New York, Inc.*, 2025 WL 1042338, at \*5 (S.D.N.Y. Jan. 22, 2025), *report and recommendation adopted,* 2025 WL 842940 (S.D.N.Y. Mar. 18, 2025) (quoting *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999) and *Trotter v. Nat'l Football League*, 737 F. Supp. 3d 172, 182 (S.D.N.Y. 2024)).

To prove a causal connection for an ADA retaliation claim, a plaintiff must show that 'but for' the protected activity, the adverse action would not have been taken.  *Sharikov v. Philips Med. Sys. MR, Inc.*, 103 F.4th 159, 170 (2d Cir. 2024) (citing *Tafolla v. Heilig*, 80 F.4th 111, 125 (2d Cir. 2023)).

i.    *Protected Activity*

As with his other claims, Mazzie is reluctant to provide necessary details here.  He fails to clearly identify specific adverse employment actions taken in retaliation for any particular protected activities.

For instance, the operative complaint suggests that Mazzie believes his termination was retaliatory, but it does not identify the protected activity or activities that prompted the alleged retaliation.  *See, e.g.*, Am. Compl., Dkt. No. 13 ¶ 102 ("Plaintiff was repulsed, offended, disturbed, humiliated, and disgusted by this blatantly unlawful, discriminatory, and retaliatory termination.").  Similarly, although the complaint references conduct that Mazzie believes prompted retaliation—chiefly, his objections to Alund's actions—it fails to identify what retaliatory actions were taken in response.  *See, e.g.*, *id.* ¶ 103 ("Defendants retaliated against Plaintiff because Plaintiff objected to Defendant Alund's discriminatory and unlawful conduct.").  The remainder of the complaint offers no further clarification.  *See, e.g.*, *id.* ¶ 107 ("The above are just some of the ways Defendants . . . retaliated against Plaintiff while employing Plaintiff.").

Mazzie's opposition papers provide slightly more insight.  He asserts that his theory of liability is based on his "repeated[] object[ions] to the hostile work environment that Alund created[,] and Admar tolerated[.]"  Pl.'s Resp., Dkt. No. 48-5 at 17; *see also id.* at 23 ("The request related to Alund's conduct are [sic] clearly related to [Mazzie's] disabilities.").  He further claims that he engaged in protected activity when "he took the day off on March 11 because of his disability and because he again objected to Alund's discriminatory conduct that day."  Dkt. No. 48-5 at 18.

"Making a good faith request for an accommodation is a protected activity"; as is "[c]omplaining to a supervisor, instituting litigation, or filing a formal complaint about the defendant's discriminatory conduct." *McSweeney v. Cohen*, 776 F. Supp. 3d 200, 251 (S.D.N.Y. 2025) (listing cases). And "[a] complaint to a supervisor need not have had merit to make it a protected activity." *Id.* (citing *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)). Rather, "an employee's complaint must only be sufficiently pointed to be reasonably understood as a complaint about discrimination, and the employee must have a good faith, reasonable belief that the underlying employment practice was unlawful." *Id.* (internal citations and alterations omitted).

Even under this lenient standard, the competent evidence in the record shows that the verbal complaints Mazzie made to defendants regarding Alund were so vague and generalized that they could not reasonably be understood as complaints about legally prohibited conduct. *See, e.g.,* Mazzie Depo., Dkt. No. 45-2 at 33 ("Q: [D]o you recall what words you used with Tim Wells, what you told him? A: No, I don't."); *id.* at 34 ("Q: During the second conversation that you had with Wells[,] did you ask him to take any specific actions? A: Maybe to speak to—I don't know—recall specifically at this moment, but I know that he spoke to us both afterwards, so I may have asked him to, you know, maybe diffuse the situation."); *id.* at 35 ("Q: 'In or around early February 2021, Plaintiff again complained to Defendant Wells regarding Defendant Alund's behavior, reiterating it was worsening his anxiety[.]' Do you recall what words you used with Mr. Wells on this occasion? A: I don't know exactly the words, no."); *see also Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 594 (2d Cir. 1988) (plaintiff failed to meet his burden where he "neither pointed out discrimination against particular individuals nor discriminatory practices").

The only written communications from Mazzie that are in the record also fail to suggest a belief on Mazzie's part that Alund's conduct was discriminatory. As discussed at length above, the text exchange from March 11–12, 2021, although critical of Alund, is not sufficiently specific to be understood as a complaint regarding discrimination.

Likewise, the text exchange on March 2, 2021, in which Mazzie expressed frustration over Alund allegedly spreading a rumor that an Admar driver quit due to a personality conflict with Mazzie, does not indicate any belief that her conduct was discriminatorily or unlawfully targeted at him. Rather, Mazzie's comments suggest annoyance at Alund's generally abrasive behavior. *See* Dkt. No. 43-4 at 1 ("Thank you for that. She's been really snotty and has given me attitude all day."); *id.* ("[S]he literally talks shit about every person here behind their backs.").

Even construed in the light most favorable to Mazzie, the substance of his conversations with Wells, as reflected in the record, were too vague to constitute protected activity. *See, e.g.*, *Barney v. H.E.L.P. Homeless Serv. Corp.*, 2021 WL 4267629, at *21 (S.D.N.Y. Sept. 20, 2021) ("Plaintiff's conclusory assertion that [manager] necessarily knew that he was emailing [senior vice president] to complain about her alleged discriminatory comments—when he had never before complained about discrimination, and his email indicated nothing of the sort—does not compel a different finding."); *Bisang v. New York State Educ. Dep't*, 2023 WL 5351159, at *17 (N.D.N.Y. Aug. 21, 2023) (Sannes, C.J.) (holding that a plaintiff's statements that supervisor had "been on her back," that she was "at the end of her rope," and her request that management "do something about [supervisor] and keep her away" were too vague to constitute protected activity); *see also Barney*, 2021 WL 4267629, at *21 ("complaint 'too generalized' where it indicated that plaintiff was 'suffering harassment,' but '[said] nothing about the harassment being based on a protected characteristic'") (citing *Gonzalez v. New York City Health & Hosp. Corp.*,

2019 WL 2435622, at *10 (S.D.N.Y. June 11, 2019)); *id.* (employee's complaint to employer

"insufficient where plaintiff 'conceded in his deposition that he did *not* suggest [in that

complaint] that he had encountered any race or national origin discrimination'") (quoting *Lugo v.*

*Le Pain Quotidien*, 2015 WL 1808558, at *7 (S.D.N.Y. Apr. 13, 2015), *aff'd,* 654 F. App'x 7 (2d

Cir. 2016)) (emphasis in original); *Ochei v. Coler/Goldwater Mem'l Hosp.*, 450 F. Supp. 2d 275,

287 (S.D.N.Y. 2006) ("[Plaintiff] has claimed that she was retaliated against for complaining

about observations of her work, and other allegedly adverse actions[;] [h]owever, because she

does not allege that she ever complained to her supervisors that she was the victim of

discrimination, these complaints are not protected activity as a matter of law.").

    *ii.    Causation*

    Even assuming the Court were to find that some of Mazzie's actions constituted protected

activity, he cannot establish a prima facie case of retaliation, as he has failed to demonstrate a

causal connection between any allegedly protected activity and his termination.

    A plaintiff may demonstrate a causal connection between their "engagement in protected

activity and materially adverse retaliatory action either 'directly, through evidence of retaliatory

animus directed against the plaintiff by the defendant' or 'indirectly, by showing that the

protected activity is followed closely by discriminatory treatment or through other circumstantial

evidence such as disparate treatment of fellow employees who engaged in similar conduct.'"

*O'Brien v. City of New York, Dep't of Educ.*, 686 F. Supp. 3d 221, 236 (E.D.N.Y. 2023) (quoting

*Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir. 2010)).

    "Temporal proximity between the protected activity and the adverse action may suffice to

establish a prima facie claim of retaliation." *Bisang*, 2023 WL 5351159, at *17. However,

"[t]emporal proximity alone is insufficient to defeat summary judgment[.]" *Clawson v. City of*

38

*Albany Dep't of Fire & Emergency*, 2023 WL 2456065, at *8 (N.D.N.Y. Mar. 9, 2023)

(D'Agostino, J.), *aff'd*, 2024 WL 1044531 (2d Cir. Mar. 11, 2024)  (quoting *Zann Kwan v.

Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013)).

Mazzie insists that "the record is rife with evidence . . . [that] Defendants held a

retaliatory . . . animus towards Plaintiff[,]" but leaves it to the Court to ascertain what that

evidence might be.  *See* Pl.'s Resp., Dkt. No. 48-5 at 22.

Yet Mazzie offers the same, or even less, specificity in support of his retaliation claims as

he does for his claims of discrimination.  Many of the conclusory statements he makes about

alleged discrimination are identical to those he asserts in support of his retaliation claim.  *See,

e.g.*, Dkt. No. 48-5 at 22 ("[T]he record is rife with evidence that Defendants held a retaliatory

and discriminatory animus towards Plaintiff."); *id.* ("[D]efendants' conduct that created the

hostile work environment and that established Plaintiff's prima facie cases for retaliation and

discrimination should be considered during the discussion of pretext."); *id.* at 25 ("[D]efendants

contend that Plaintiff's request that Defendants not condone the discriminatory and retaliatory

hostile work environment that Alund created was a per se unreasonable request[.]"); *id.* at 26

("Here, Plaintiff requested that Defendants not condone Alund's discriminatory and retaliatory

behavior and was not offered any sort of accommodation."); *id.* at 7 ("[S]ummary judgment is

improper for Defendants have failed to adequately challenge Plaintiff's prima facie cases of

discrimination and retaliation.").

The Court need not belabor this analysis.  The record, viewed in the light most favorable

to Mazzie, reflects only his speculative belief that his termination was retaliatory.  But "whether

Defendants' actions were unreasonable, unfair or even untrue, . . . without any showing of

retaliatory motive, they do not support Plaintiff's retaliation claim." *Rapp v. Esper*, 2023 WL 2666673, at *9 (D. Conn. Mar. 28, 2023).

Mazzie's ADA retaliation claim must be dismissed.

### E.    NYSHRL Claims

Having disposed of Mazzie's claims under the ADA, the Court declines to exercise supplemental jurisdiction over his remaining NYSHRL claims. *See* 28 U.S.C. § 1367(c). When deciding whether to exercise supplemental jurisdiction, courts consider "the traditional values of judicial economy, convenience, fairness, and comity." *Bibliotechnical Athenaeum v. Am. Univ. of Beirut*, 527 F. Supp. 3d 625, 638 (S.D.N.Y. 2021), *aff'd,* No. 21-1642, 2022 WL 710896 (2d Cir. Mar. 10, 2022) (internal citations omitted). "Once all federal claims have been dismissed, the balance of factors will 'usually' point toward a declination." *Lundy v. Cath. Health Sys. of Long Island Inc.*, 711 F.3d 106, 118 (2d Cir. 2013) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). Because this is a "usual case in which all federal-law claims are eliminated before trial," *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 119 (2d Cir. 2006), and there are no exceptional circumstances present, the Court declines to exercise supplemental jurisdiction over Mazzie's state-law claims and will dismiss those claims without prejudice.

## V.    CONCLUSION

Therefore, it is

**ORDERED** that

1. Defendants' motion for summary judgment (Dkt. No. 43) is **GRANTED**;

2. Plaintiff's claims under the Americans with Disability Act are **DISMISSED with prejudice**; and

3. Plaintiff's New York Human Rights Law claims are **DISMISSED without prejudice**.

The Clerk of Court is directed to terminate the pending motion (Dkt. No. 43), enter a judgment accordingly, and close the case.

**SO ORDERED.**

Dated: September 26, 2025

Anthony J. Brindisi
U.S. District Judge